UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAYVON R. FLEMMING,

    Plaintiff,

  v.                                                         Case No. 19-CV-1166

MARTHA BREEN,

    Defendant.

## ORDER

Plaintiff Jayvon Flemming filed a lawsuit under 42 U.S.C. § 1983, alleging that defendant Dr. Martha Breen violated his civil rights. (ECF No. 1.) The court screened the complaint and allowed Flemming to proceed with a claim that Breen was deliberately indifferent to the risk of harm Flemming posed to himself. (ECF No. 9.) On July 6, 2020, Breen filed a motion for summary judgment. (ECF No. 20.) That motion is fully briefed and ready for the court's decision.

1. **RELEVANT FACTS**

At the relevant time Flemming was incarcerated at Green Bay Correctional Institution. (ECF No. 27 at ¶ 1.) Breen was a licensed psychologist in the Psychological Services Unit (PSU). (*Id.* at ¶ 2.) Her duties included mental health screenings, conducting brief individual counseling and mental health monitoring, providing crisis intervention and prevention, individual psychotherapy, and making psychological assessments to provide mental health services. (*Id.*)

On October 17, 2013, Dr. Zirbel—Flemming's primary provider at that time—placed Flemming on observation status because Flemming had stated that he wanted to cut himself and did not feel safe in the institution. (ECF No. 27 at ¶ 3.) Observation status is a non-punitive, restrictive status used to ensure an inmate's safety and the safety of others when an inmate poses a danger to himself. (*Id.*) Inmates on observation status are housed in the restrictive housing unit. (*Id.* at ¶ 4.) When an inmate is on observation status, staff visibly check on the inmate at least every fifteen minutes and document their checks in a log. (*Id.*) Supervisors, health services staff, and psychological services staff also document their observations and interactions with inmates in this log. (*Id.*)

Breen explains that Flemming has a history of demanding placement in observation status when he is upset with staff. (ECF No. 22 at ¶ 7.) According to Breen, Flemming requests these placements for secondary gain, such as getting a new cell, drawing attention to issues like property access, or complaining about staff. (*Id.*) She asserts that Flemming has engaged in numerous non-lethal and low-risk cutting events after threatening to hurt himself. (*Id.*) Breen explains that, prior to his October 17, 2013 placement onto observation status, there is no record of Flemming engaging in a serious self-harm attempt that resulted in an off-site trip for treatment or placement in bed restraints. (*Id.*) Flemming concedes that some of his requests to be placed on observation status were for secondary gain, but he explains that other times he requested to be placed on observation status because he was

2

suicidal, wanted to hurt himself, or was hallucinating. (ECF No. 27 at ¶7; ECF No. 28 at ¶¶ 5-6.)

From October 17, 2013, through November 10, 2013 (the day before the incident at issue), Breen saw Flemming five times to review his placement on observation status. (ECF No. 27 at ¶ 10.) When he was placed on observation status, Flemming was allowed to have a mat, smock, and blanket. (*Id.* at ¶ 5.) The only change Breen made to his allowable property while he was on observation status was to let him have a regular mattress in exchange for a mat. (*Id.* at ¶ 10.) On three of the five visits Flemming refused to participate in the review or respond to Breen. (*Id.*) On the other two visits he continued to communicate suicidal intention, so Breen continued his placement on observation status with fifteen-minute checks. (*Id.*)

On October 21, 2013, a report about Flemming's status indicated that he was "…unwilling to work on his issues and appears to be pursuing an agenda, seemingly to be moved out of GBCI at this time." (ECF No. 27 at ¶ 8.) A week later, on October 30, 2013, Breen noted in a report that, "Given the willful nature of his actions and his refusal to cooperate with PSU, there may be a secondary gain aspect preventing his cooperation with PSU." (*Id.* at ¶ 9.)

On November 11, 2013, at about 11:07 a.m., Breen went to Flemming's cell for a daily PSU observation check. (ECF No. 27 at ¶ 11.) Flemming talked about his treatment needs and that he was still suicidal because those needs were not being met. (*Id.*) Breen asked Flemming if he had talked to Dr. Zirbel. (*Id.*) Flemming said he had, but expressed that she would not give him treatment. (*Id.*) Breen encouraged

3

Flemming to continue to work with Dr. Zirbel. (*Id.*) Breen asserts that Flemming was smiling, talking very animatedly, talking to others, and often laughing during their conversation. (ECF No. 22 at ¶¶ 12-13.) Flemming disputes Breen's characterization of how he acted during the conversation. (ECF No. 27 at ¶¶ 12-13.) He states that he was very serious during their conversation and that he was not laughing or talking to other inmates. (ECF No. 28 at ¶ 21.)

Breen asserts that she told Flemming he would continue in observation status and then ended their conversation. (ECF No. 22 at ¶ 14.) Breen says that at no point during the conversation did Flemming tell her that he was going to cut himself. (*Id.*) Flemming asserts that he told her he was suicidal and that he was having thoughts of cutting himself and that he needed to be strapped down. (ECF No. 27 at ¶ 14; ECF No. 28 at ¶ 8.) He states that Breen told him there was no reason to strap him down because he was already on observation status. (ECF No. 28 at ¶ 9.)

According to Breen, she made detailed notes about her conversation with Flemming because clinicians regularly rely on these records when making care and treatment decisions. (ECF No. 22 at ¶ 15.) Her notes contain no mention of Flemming stating that he wanted to cut himself or that he needed to be strapped down. (*Id.*) Breen explains that she continued Flemming's placement on observation status because he continued to report suicidal ideation and hopelessness. (ECF No. 22 at ¶ 16.) She asserts that it was uncertain at that specific time whether secondary gain, such as transfer to another institution, was playing a role in his behavior; however,

4

based on her observations of the way he was acting, she suspected secondary gain was motivating him. (*Id.*)

Less than a half an hour later, a PSU staff member reported to correctional officer Holmes that Flemming had a razor blade and was cutting himself. (ECF No. 22 at ¶ 17.) Correctional staff removed Flemming from his cell. (*Id.* at ¶ 18.) Flemming voluntarily gave the razor blade to Captain Lesatz and refused medical treatment. (*Id.*) Flemming asserts that he told Lesatz that he was going to keep cutting himself and needed to be strapped down. (ECF No. 28 at ¶ 11.) According to Flemming, Lesatz told him it was Breen's decision whether to strap him down; he told Flemming he would relay his comments to Breen. (*Id.*) Flemming states that Lesatz later told him that Breen said there was no reason to strap him down, so Lesatz put him back in his cell. (*Id.* at ¶ 13.) Records from that day do not indicate that staff contacted Breen after Flemming cut himself. (ECF No. 24-2 at 3.)

About an hour later, at 1:00 p.m., Breen was in the restrictive housing unit checking on an inmate who was housed next to Flemming. (ECF No. 27 at ¶ 19.) Flemming asked Breen, "Can I fuck you in your ass?" and made other sexual comments. (*Id.*) Breen told Flemming a conduct report would be written for his behavior. (*Id.* at ¶ 20.) Flemming was later found guilty and given 180 days in disciplinary separation. (*Id.* at ¶ 21.) Flemming reported at the disciplinary hearing that he did not think he would get in trouble for making a statement like that while he was on observation status. (*Id.* at ¶ 22.)

5

Case 2:19-cv-01166-WED   Filed 08/13/20   Page 5 of 13   Document 31

Breen explains that, because Flemming had voluntarily given up the razor blade to Lesatz, had willingly come out of his cell, and was otherwise cooperative and calm, she did not think any other precautions, such as reduction in property, constant observation, or restraints, were necessary. (ECF No. 22 at ¶ 23.) Flemming asserts that Breen did not talk to him to evaluate whether he posed a danger to himself. (ECF No. 27 at ¶ 23.) Flemming asserts that he had other property he could have used to hurt himself, such as a fingertip toothbrush, toothpaste, a towel, a crayon, and paper. (*Id.*; ECF No. 28 at ¶ 27.)

About two hours later, at 2:45 p.m., during a regular fifteen-minute check, Flemming showed correctional officer Draz blood coming from cuts on his left arm. (ECF No. 27 at ¶ 24.) There was also a pool of blood on the floor. (*Id.*) Flemming said he had cut himself with half of a razor blade that he had subsequently swallowed. (*Id.*) Lesatz was called and a cell search was performed but no razor or other harmful instrument was found. (*Id.*)

Nurse Alsteen was called to examine Flemming's cuts. (ECF No. 27 at ¶ 25.) She noted four small cuts total (1-1.5 cm long) on Flemming's arm and applied "Kling tape" to the three fresh cuts (a fourth cut from earlier that morning was not actively bleeding). (*Id.*) She scheduled him to get a suture the following day, but he later refused all care. (*Id.*) There is no mention in Draz or Alsteen's reports of Flemming stating that Breen had failed to protect him or that he wanted to be strapped down for his safety. (*Id.* at ¶ 27.)

6

Case 2:19-cv-01166-WED   Filed 08/13/20   Page 6 of 13   Document 31

There is no record of Breen being contacted after the second incident. (ECF No. 22 at ¶ 28.) Flemming asserts that he told Lesatz he needed to be strapped down, and Lesatz told him that he had talked to Breen and she said there was no need to strap him down. (ECF No. 28 at ¶ 16.) Flemming insists that Lesatz's incident report was either destroyed or is unavailable. (ECF No. 27 at ¶ 28.) He insists Breen was notified of the second cutting incident. (*Id.*)

**2. Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

**3. Analysis**

The Eighth Amendment prohibits "cruel and unusual punishments" and "imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate care." *Phillips v. Diedrick*, 18-C-56, 2019 WL 318403 at *2 (E.D. Wis. Jan. 24, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). While a prison official's deliberate indifference to a prisoner's substantial risk of serious harm violates the Eighth Amendment, not

7

every claim by a prisoner that he did not receive adequate care will succeed. *Id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). To survive summary judgment a plaintiff must provide evidence from which a jury could reasonably conclude that "(1) his medical need was objectively serious, and (2) the defendant[] consciously disregarded this need." *Berry v. Lutsey*, 780 F. App'x 365, 368-69 (7th Cir. 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

To be sure, prison staff have a duty to prevent inmates from causing serious harm to themselves. *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 775-76 (7th Cir. 2014). However, before an official will be liable for ignoring a risk of self-harm, the "risk of future harm must be sure or very likely to give rise to sufficiently imminent dangers." *Davis-Clair v. Turck*, 714 F. A'ppx 605, 606 (7th Cir. 2018) (internal quotation marks omitted).

Further, although the Court of Appeals for the Seventh Circuit has not directly addressed this point, discussions in dicta and holdings by district courts suggest that the Constitution obligates prison officials to step in and prevent sane prisoners from harming themselves only when the threatened harm is sufficiently serious. *See, e.g., Freeman v. Berge*, 441 F.3d 543, 546-47 (7th Cir. 2006) (explaining that "at some point," to ensure a prisoner is not "seriously endangering his health," prison officials would have a duty and right to step in and force a prisoner on a hunger strike to take nourishment); *see also Davis v. Gee*, 14-cv-617, 2017 WL 2880869 at *3-4 (W.D. Wis. July 6, 2017) (holding that, to show a constitutional injury, the harm must present

8

an objective, sufficiently serious risk of serious damage to future health, and swallowing a handful of Tylenol fails to do that).

Flemming asserts that, because Breen ignored his threats of self-harm, he made four small cuts to his arm. The court finds that no jury could reasonably conclude that Flemming posed a risk of *serious* harm to himself even though he possessed a razor. Flemming acknowledges that "a lot of times [he] [e]ngaged in self harm [] to release [his] stress and frustration. Cutting [him]self was a coping mechanism and intentionally took control and became a habit." (ECF No. 26 at 2.) Flemming presents no evidence to support a conclusion that this form of coping—although self-destructive—placed him in grave or serious danger, and courts have consistently held that minor cuts are not objectively serious. *See James v. Cartwright*, 659 F. App'x 888, 890 (7th Cir. 2016); *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (explaining that inflicting minor cuts on his arm following a suicide threat made for attention fails to present a cognizable harm). And, while Flemming states that sometimes he has engaged in self harm in an attempt to kill himself, the evidence shows that none of Flemming's self-inflicted injuries ever required an off-site trip for treatment or placement in bed restraints, thus undermining his assertion that he posed a risk of *serious* harm to himself.

Further, even if a jury could conclude that four small cuts requiring a suture established that Flemming posed a risk of serious harm to himself, no jury could reasonably conclude that Breen was deliberately indifferent to that risk. Breen believed Flemming's threats of self-harm may have been motivated by secondary

9

gain, namely, his desire to be transferred to a new institution. Despite this suspicion and despite knowing Flemming had made many idle threats in the past, she continued Flemming's placement on observation status as a precaution, where his property was severely limited and he would be observed by correctional staff every fifteen minutes. No jury could reasonably conclude that in taking these precautions Breen was deliberately indifferent to any risk Flemming posed to himself.

Flemming states that he specifically told Breen he wanted to be on restraints because he felt like cutting himself, but the Constitution does not empower inmates to dictate their own treatment. *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) (explaining that prison doctors are free to make their own independent medical determinations as to the necessity of certain treatments as long as the determination is based on the physician's professional judgment and does not go against professional standards). According to Flemming, Breen told him she did not believe restraints were necessary.

As far as Breen knew, Flemming did not have access to anything with which he could seriously cut himself (Flemming did not tell her he was hiding a razor blade), and she knew that officers would be physically observing Flemming every fifteen minutes. Flemming presents no evidence suggesting that, with these considerations in mind, Breen's decision *not* to impose a significant restraint on his movement went against professional standards. Flemming establishes only that he disagrees with her professional judgment that restraints were unnecessary, but his disagreement is insufficient to establish an Eighth Amendment violation. *Pyles v. Fahim*, 771 F.3d

10

403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.").

Flemming asserts that the first time he cut himself he inflicted a single small cut (he inflicted three additional cuts later). After doing so, he was removed from his cell and voluntarily gave the razor blade to officers. Breen explains that she did not believe restraints were necessary after this incident. The self-inflicted injury was minor (consistent with his history of inflicting minor injuries for secondary gain), he had given up the razor blade he used to cut himself (he did not tell anyone he was hiding part of another razor blade), and he would be monitored by staff every fifteen minutes. Again, Flemming disagrees with Breen's professional judgment that restraints were not necessary, but he provides no evidence suggesting that, based on the information she knew at that time, "no minimally competent professional would have so responded under those circumstances." *Pyles*, 771 F.3d at 409.

Finally, Flemming presents no admissible evidence to support his assertion that Breen was notified that Flemming had cut himself a second time. A defendant who is unaware that a risk exists cannot be found to have been deliberately indifferent to that risk. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw that inference."). Further, even if Flemming could establish that Breen knew about the second cutting

incident, his claim that she was deliberately indifferent when she refused to place him in restraints would fail because Flemming did not inflict any further injury to himself after the second incident. As the Seventh Circuit has explained, to succeed under § 1983 a plaintiff must establish both that a state actor violated his constitutional rights *and* that the violation caused the plaintiff injury or damages. *Lord*, 952 F.3d at 905 (citations omitted). Even if Breen's failure to place Flemming in restraints after the second cutting incident violated the Constitution, that violation did not result in any further injury to Flemming. As a result, his claim necessarily fails.

4. Conclusion

**IT IS THEREFORE ORDERED** that Breen's motion for summary judgment (ECF No. 20) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The clerk's office will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment

under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I may not extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 13th day of August, 2020.

**BY THE COURT:**

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge